IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                                                         CR No. 11-1320 RB

MARTIN HORTON,

    Defendant.

**PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**

**THIS MATTER** comes before the Court on Defendant Martin Horton's *Motion to Suppress*, (Doc. 23), and the *United States' Response to Defendant's Motion to Suppress*, (Doc. 24). The Honorable United States District Judge Robert C. Brack referred the *Motion to Suppress* to this Court for a recommendation on the motion. (Doc. 29). The Court heard oral arguments on the motion on August 10, 2011, and, at the Court's direction, both parties have submitted *Proposed Findings of Fact and Conclusions of Law*. (*See* Doc. 41; Doc. 42). The Court, having considered the motion, the relevant law, and otherwise being fully advised in the premises, **RECOMMENDS** that Defendant's *Motion to Suppress* be **GRANTED**.

    **I.**    **BACKGROUND**

Mark Mahone is a detective assigned to the special investigations division in the Roswell Police Department in Chavez County, New Mexico. (*Transcript of Hearing*, *8/10/11*, at 4).[1] He has been an officer for approximately ten years. (*Id.*). Det. Mahone is

---

[1] All further references to the transcript of the hearing shall be cited as "TR"

typically assigned to patrol duties and he also responds to calls and investigates all criminal activity. (*Id.* at 4-6). On February 3, 2011, Det. Mahone was patrolling in an unmarked police car, though he was armed and wearing his uniform. (*Id.* at 5-7, 30). Shortly before eleven o'clock that morning, Det. Mahone saw a white Ford Taurus driving near 18th Street and Cambridge in Roswell. (*Id.* at 7). Det. Mahone saw that the Taurus had a cracked windshield and it looked as though the two rear passengers were not wearing seatbelts. (*Id.*). The detective initiated a traffic stop and he approached the car on the passenger side, which he claims he typically does to minimize his exposure to vehicular traffic and the stopped car's occupants. (*Id.* at 7-8). He discovered that there were four people in the car - a male driver and three female passengers - and he confirmed that the women in the rear were not wearing seat belts. (*Id.* at 8, 45). Upon reaching the car, the detective also saw what appeared to be an open container of beer in the netting at the back of the front passenger seat. (*Id.* at 8-9). While Det. Mahone initially testified that a small amount of alcohol remained in the beer bottle when he found it, he later testified that he wasn't sure whether the bottle was empty or not. (*Id.* at 8-9; 27-28).

The detective began speaking with Mr. Horton, the driver of the Taurus. Prior to the stop, Det. Mahone had never seen Mr. Horton before and he did not know him. (*Id.* at 9, 35). Mr. Horton provided his driver's license, insurance, and registration. (*Id.* at 9-10). Det. Mahone advised Mr. Horton that he had seen an open container of alcohol in the backseat and he asked if there were any other open bottles in the car. (*Id.* at 10-11). Mr. Horton claimed that there were no other open bottles. (*Id.* at 10-11). The detective then requested permission to search the car for open containers, to which Mr. Horton consented. (*Id.* at 11). The detective also asked if there were any drugs or weapons in the car and Mr. Horton

claimed that there were not. (*Id.*).

Because he intended to search the car, Det. Mahone instructed Mr. Horton and the other passengers to exit the car one at a time. (*Id.* at 12). Mr. Horton was the first to exit the car and the detective approached and told Mr. Horton that he was going to perform a pat-down search to ensure that Mr. Horton didn't have any weapons on him. (*Id.* at 12, 33). He intended to pat down every person in the car as they came out. (*Id.* at 18).

Det. Mahone always pats down car occupants before searching the car so as to ensure that they are not carrying weapons or narcotics and are not a threat to him. (*Id.* at 12-14). He believes that car occupants pose a safety threat because Roswell is a high crime area. (*Id.* at 4-5, 31-32). Roswell has a lot of violent crime, including shootings, homicides, robberies, and a lot of drug activity. (*Id.* at 5). While he could not recall the specific statistics, he believes that Roswell has one of the highest crime rates per capita in the United States. (*Id.*). In his experience, it is not uncommon to find weapons on a car's occupants or in the car during a consensual search. (*Id.* at 4-5, 20-21). Other officers have related similar experiences to him. (*Id.* at 21). He receives frequent training on officer safety through briefings and videos and his training frequently highlights the dangers of traffic stops. (*Id.* at 14).

Det. Mahone pats down every person he pulls over if he is going to search their car, regardless of their demeanor or behavior. (*See, e.g.*, *Id.* at 13-14 (stating that he conducts pat-down searches whether the individual is calm or nervous); *Id.* at 31-34)). He believes everyone in Roswell is armed and dangerous and that he is entitled to conduct pat-downs out of a generalized concern for officer safety. (*Id.* at 31-32). Other than the traffic violations and the open container, he had no reason to believe that Mr. Horton was armed or that he

was committing any crimes. (*Id.* at 26-27; 32). Mr. Horton was calm, polite, and compliant throughout the whole interaction. (*Id.* 12-13, 26-27). The presence of the open container in the backseat did not give him any particular reason to think that Mr. Horton was armed or dangerous since, in his experience, people who have been drinking are no more likely to be carrying firearms than sober individuals. (*Id.* at 37).

While Det. Mahone pats down every person he pulls over if he is going to search their car, he felt that searching all the occupants of the white Taurus was particularly appropriate since he was on his own and there were four people who would be behind him while he conducted the search of the car. (*Id.* at 14). In compliance with the police department's policy, he planned to call for backup so that another officer could keep an eye on the car's occupants while he conducted the search. (*Id.* at 18, 34).

Mr. Horton politely complied with the detective's request to perform a pat-down search. (*Id.* 12-13, 26-27). Det. Mahone patted Mr. Horton down by running his hands over Mr. Horton's outer clothing. (*Id.* at 16). While doing so, the detective felt what he believed to be firearm on the inside of Mr. Horton's jacket. (*Id.*). The detective immediately placed Mr. Horton in handcuffs and reached into his jacket to discover that Mr. Horton was carrying a loaded Smith and Wesson .9 mm semiautomatic handgun. (*Id.* at 17). At that point the detective had the remaining occupants stay in the car and he radioed for backup. (*Id.* at 17-18).

A second officer then appeared on the scene and the three passengers were removed from the car and searched. (*Id.* at 21). None of the other passengers were armed. (*Id.* at 21-22). Det. Mahone then searched the car and found a small black zipper pouch on the driver's side floorboard which contained several syringes, a spoon, and a small

amount of suspected methamphetamine. (*Id.* at 22). Mr. Horton claimed ownership of the black pouch. (*Id.*). No other weapons or alcohol were found in the car. (*Id.*).

Ironically, Det. Mahone pulled over Mr. Horton again several weeks later. (*Id.* at 35). He had no reason to believe that Mr. Horton had committed any infraction at that time. (*Id.* at 38). He pulled Mr. Horton over simply because Mr. Horton had been armed during the Feb. 3, 2011, stop and he wanted to see if Mr. Horton was still carrying a gun. (*Id.* at 38). Det. Mahone again conducted a pat-down search of Mr. Horton and searched his car. (*Id.* at 36). Nothing was found on Mr. Horton or in the car. (*Id.*).

## II.     Standard of Review

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The protections of the Fourth Amendment are enforceable against state actors through the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961).

The deciding factor in reviewing searches under the Fourth Amendment is reasonableness. In *Terry v. Ohio*, the United States Supreme Court differentiated between searches incident to a lawful arrest and searches based on the more ephemeral concept of "reasonable suspicion." *Terry v. Ohio*, 392 U.S. 1, 30-31 (1968). The Court held that police officers may lawfully seize a citizen under the Fourth Amendment if the officer has a reasonable and articulable suspicion that criminal activity has occurred or is about to

occur. *Id.* at 21; *United States v. Callarman*, 273 F.3d 1284 (10th Cir. 2001). A two-pronged test is used to assess the reasonableness of investigatory detentions and weapons searches. *United States v. Sanchez*, 519 U.S. 1208, 1212-13 (10th Cir. 2008). First, the court must decide whether the frisk was justified at its inception. *Id.* Second, the court must determine whether the officer's actions are reasonably related in scope to the circumstances which justified the inference. *id.* at 1213.

As a corollary to the general rule outlined in *Terry*, the Court further held that an officer may conduct a pat-down search of a properly detained citizen if the officer reasonably believes that the detainee is armed and dangerous. *Terry*, 392 U.S. at 24; *United States v. Brakerman*, 475 F.3d 1205, 1212 (10th Cir. 2007). In the context of a traffic stop, "[a] weapons search . . . is justified when there is reasonable suspicion based on specific and articulable facts that the subject may be dangerous and may gain immediate control of weapons." *Brakerman*, 519 U.S. at 1213 (citing *United States v. Palmer*, 360 F.3d 1243, 1246 (10th Cir. 2004)). The reasonableness of an officer's belief about a detainee's dangerousness depends on the totality of the circumstances. *United States v. Wood*, 106 F.3d 942, 946 (10th Cir.1997).

**III. Analysis**

Mr. Horton does not dispute that the initial traffic stop was permitted under the standard elucidated in *Terry* and its progeny. (Doc. 42 at 4). The stop was reasonable at its inception because Det. Mahone observed that the car had a cracked windshield and that two of the passengers were not wearing seat belts. (*Id.* at 4; TR at 7). Neither does Mr. Horton contest Det. Mahone's decision to order him out of the car after seeing the open container in the backseat. (Doc. 42 at 4; *see also Maryland v. Wilson*, 519 U.S. 408, 414-

15 (1997)). Defendant's sole contention is that Det. Mahone's decision to conduct a pat-down search of Mr. Horton was not based on any reasonable suspicion that Mr. Horton was armed or dangerous and that the search therefore violated the Fourth Amendment. (Doc. 23 at 4-6; Doc. 42 at 5). The Court agrees.

In this case, Det. Mahone did not testify to any facts which would support a reasonable belief that Mr. Horton was armed or dangerous. The detective initially stopped the car due to the windshield and seatbelt violations and he further investigated Mr. Horton for an open container. (TR at 7-9). There wasn't anything unusual about Mr. Horton's behavior during the traffic stop. (*Id.* at 27). Other than the traffic and open container violations, the detective had no reason to believe that Mr. Horton had committed any crimes. (*Id.* at 32). In addition, Mr. Horton was calm, polite, and compliant throughout the whole interaction. (*Id.* at 12-13, 26-27).

Det. Mahone searched Mr. Horton simply because Roswell is a high crime area and so he assumes that every single person he pulls over is armed and dangerous. (*Id.* at 31). Det. Mahone pats down every person he pulls over if he's going to perform a search of their car, regardless of their demeanor or behavior. (*Id.* at 31-32 (stating that, regardless of the circumstances, he believes that all motorists are armed and he therefore pats them down); *see also, Id.* at 34 ("Like I said, I believe that they're all armed. I always believe that until I [pat them down and] find otherwise.")). Because there is no evidence in the record which would support a finding that Det. Mahone reasonably believed that Mr. Horton presented a threat to his safety, his decision to conduct a pat-down search violated the Fourth Amendment.

The United States does not argue that Det. Mahone had any reason to believe that

Mr. Horton posed a threat to him. The United States argues that, because Roswell is a high-crime area, Det. Mahone was justified in assuming that every motorist he pulls over is armed and dangerous and that his decision to conduct a pat-down search was reasonable. (*See, e.g.*, Doc. 41 at 16 ("Detective Mahone testified that the City of Roswell is a high crime area . . . [and] [b]ecause officers can't conduct consent searches with individuals standing behind them unless the officer knows he is safe from harm . . . it is reasonable for an officer to conduct a *di* [sic] *minimis* patdown.")). The United States' argument fails as a matter of law.

It is true that traffic stops can be unpredictable and courts have consistently recognized the heightened security concerns attendant to such stops. *See, e.g.*, *United States v. Holt*, 264 F.3d 1215, 1223 (10th Cir. 2001) (en banc) ("An officer in today's reality has an objective, reasonable basis to fear for his or her own life every time a motorist is stopped."). For that reason, police officers are entitled to take a number of actions to protect themselves during traffic stops without violating the Fourth Amendment. *Id.* at 1223 (noting that officers may, *inter alia*, order the driver and passengers remain in or step out of the vehicle, open the door of a darkly tinted vehicle to check for weapons, and use a flashlight to check the dark interior of a car) (collecting cases). However, such measures do not include performing pat-down searches of every single occupant of a stopped vehicle without any objective reason to believe that the person may be armed or dangerous. The law is clear - a police officer is entitled to perform a pat-down search only if the officer "has reason to believe that he is dealing with an armed and dangerous individual." *United States v. Rice*, 483 F.3d 1079, 1082-83 (10th Cir. 2007) (quoting *Terry*, 392 U.S. at 27).

To accept the United States' argument is to accept that officers may pat down every

single occupant of every car that is stopped and searched, so long as the officer works in a high-crime area. Such a rule would eviscerate the balancing act that *Terry* was meant to strike. *See, e.g.*, *Terry*, 392 U.S. at 26 (noting that allowing an officer to search a person he reasonably believes to be dangerous strikes a balance between "the neutralization of danger to the policeman in the investigative circumstances and the sanctity of the individual."). While the range of permissible police conduct has expanded in the decades since *Terry* in an effort to safeguard officers, the Supreme Court has never relaxed the requirement that an officer must have individualized suspicion that a person poses a security threat before a pat-down search may be effected. *See, e.g.*, *Arizona v. Johnson*, 555 U.S. 323, 129 S. Ct. 781, 784 (2009) ("To justify a patdown of the driver or a passenger during a traffic stop, however, just as in the case of a pedestrian reasonably suspected of criminal activity, the police must first harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous."); *Ybarra v. Illinois*, 444 U.S. 85, 94 (1979) ("Nothing in *Terry* can be understood to allow a generalized "cursory search for weapons" or indeed, any search whatever for anything but weapons. The "narrow scope" of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked . . .").

Because Det. Mahone never reasonably believed that Mr. Horton was either armed or dangerous, the pat-down search violated the Fourth Amendment. All evidence resulting from that search - including the .9 mm handgun found in Mr. Horton's jacket pocket - must be suppressed as fruit of the poisonous tree. *Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963).

**IT IS THEREFORE RECOMMENDED** that Mr. Horton's *Motion to Suppress* be

**GRANTED**.

> **THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed.**

_____
THE HONORABLE CARMEN E. GARZA
UNITED STATES MAGISTRATE JUDGE